# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

| | | |
|---|---|---|
| JOHN F. ARMSTRONG, SAMUEL BURTON, MIKE KARAMOLENGOS, ROBIN MATZ, ROBERT PEARSON, MATTHEW WOODARD, ALFRED REESE, STEVEN SNIPES, JASON JOHNSON, JOHN B. WELLS, and TRANSPORT INSURANCE COMPANY/CNA, | : : : : : : | CIVIL ACTION |
| Plaintiffs, | : | |
| v. | : | |
| DURANGO GEORGIA PAPER COMPANY, | : | |
| Defendant. | : | NO. CV202-085 |

## O R D E R

Plaintiffs, John F. Armstrong, Samuel Burton, Mike Karamolengos, Robin Matz, Robert Pearson (also known as Stephen Pearson), Matthew Woodard, Alfred Reese, Steven Snipes, Jason Johnson, John B. Wells, and Transport Insurance Company/CNA, filed the above captioned case against Durango Georgia Paper Company ("Durango"), asserting negligence claims under Georgia law.

AO 72A
(Rev. 8/82)

Presently before the Court is Durango's motion for summary judgment as to the claims of Burton, Matz, Pearson, Reese, and Wells (the "Summary Judgment Plaintiffs"). Because the Summary Judgment Plaintiffs have produced some evidence that they were injured as a result of Durango's conduct, the motion will be **DENIED**.

## BACKGROUND

Durango operated a paperboard mill in St. Marys, Georgia. In 2000, the company needed to repair its lime kiln, a large oven used in the mill's commercial operations. Durango subcontracted the work to North American Kiln Services, LLC ("NAK"). The individual Plaintiffs, all Florida residents, were NAK ironworkers assigned to the job. On May 22, 2000, Plaintiffs began working at the Durango plant. The NAK workers performed their work in two shifts, lasting twelve hours each.

Plaintiffs allege that during the night shift on June 2, 2000, Durango employees dumped chlorine dioxide liquid into the bleach plant's hot well, which emptied into the plant's sewer system. On that evening, Armstrong, Burton, Matz, and Pearson were working on the lime kiln. The kiln was located outdoors, approximately fifty feet from the chlorine dioxide plant. The

men were working at both ends of the lime kiln. At around 11:00 PM, Armstrong reported that he and Pearson were working in the kiln when Burton informed the pair that there had been a hazardous gas release and that they needed to evacuate. Plaintiffs allege that no warning of the gas release was given to the workers beforehand. During Armstrong's deposition, he stated that he observed a large green cloud hovering over them when he looked at the light.[1] According to Plaintiffs, this cloud of chlorine dioxide arose from the sewer near the lime kiln.

As the men were attempting to evacuate, they assert that they came into contact with chlorine dioxide gas. Upon exposure, Pearson began coughing, gagging, and became nauseated. He also felt a burning sensation in his lungs. Matz also began coughing, experienced a choking sensation, felt nauseated, and his eyes and throat burned. Further, Matz asserts that he was rendered unconscious. When Matz came to, he began vomiting. Likewise, Burton reported feeling nauseated, having trouble breathing, and feeling like his throat was raw. Armstrong experienced similar symptoms. After

---

[1] Durango's medical expert, Dr. Scott Phillips, described chlorine dioxide gas as a yellow-green or orange gas.

3

the exposure, all were transported to the Camden Medical Center emergency room for treatment, either by ambulance or private vehicle. The men were released from the hospital in the early morning hours of June 3, 2000.

Later that day, a safety meeting was held at Durango to discuss ways to prevent future exposure incidents. Durango's representatives and the NAK workers agreed that Durango employees would monitor plant conditions while NAK employees were working on the kiln, and that the NAK workers would be evacuated at any time it was possible that they could be exposed to a harmful gas.

Matz returned to the emergency room on June 3, 2000, complaining of severe chest tightness, nausea, sore throat, shortness of breath, and a cough. He was discharged that day in good condition, with medications. On June 4, 2000, Matz was again evaluated at the hospital, and a physical examination revealed abnormal breath sounds in both lung fields.

By June 4, 2000, NAK employees were back at work on the kiln. The ironworkers on the day shift were evacuated on two or three occasions without incident that day. Later that afternoon, Durango employees were working on a railcar that

4

contained chlorine gas, and a pressure valve on the railcar showed, erroneously, that the railcar was empty.

As an evacuation of NAK workers was taking place, a Durango employee opened the valve, releasing chlorine gas into the air, and exposing Snipes, Reese, Karamolengos, and Wells to the toxic fumes. Plaintiffs contend that this exposure occurred without warning. Their co-worker, Jason Johnson, witnessed a green cloud envelop the area like a fog. According to Dr. Phillips, chlorine gas is greenish-yellow color.

Upon exposure, the day shift workers began experiencing symptoms similar to those suffered by the night shift workers. Wells reported that he had difficulty breathing, was coughing, and that his eyes and body had a burning sensation. Reese became lightheaded, dizzy, nauseated, and broke out in hives. Snipes and Karamolengos experienced similar symptoms. Like their night shift co-workers, they were all transported to the local hospital emergency room for treatment and evaluation.

Durango's expert, Dr. Phillips, has explained that upon sufficient exposure to chlorine gas and chlorine dioxide gas, adverse effects can be felt in a person's mucous membranes and respiratory tract. With respect to chlorine gas, Dr. Phillips stated that the degree of injury suffered as a result of an

5

exposure will vary, depending in part upon "the moisture content of the affected tissue and specific host susceptibilities." Dkt. No. 142, Ex. O, Phillips Report at 56. Dr. Phillips recognized that the larger the dose and duration of the exposure, the more severe the health effects on those exposed. According to Dr. Phillips, at very high levels of exposure (1000 parts per million, or "ppm"), death can result within a few minutes of exposure. At lower levels of exposure (30 ppm), the upper respiratory tract can become irritated, and chest pain, vomiting, cough, and shortness of breath can result. Dkt. No. 142, Ex. O, Phillips Report at 57.

Dr. Phillips also recognized that exposure to chlorine dioxide gas can have deleterious effects. He reported that concentrations of more than 5 ppm can cause irritation of the mucous membranes, and that higher levels of exposure may cause coughing and wheezing. Dkt. No. 142, Ex. O, Phillips Report at 61.

Plaintiffs assert that these gassing events caused them to endure respiratory distress, which varied depending on their levels of exposure. According to the Summary Judgment Plaintiffs, all had temporary injuries as a result of their exposure. All have sought treatment at several hospitals and

6

consulted with numerous specialists in the pulmonary medicine field. Burton asserts that he developed Reactive Airways Dysfunction Syndrome ("RADS") as a result of the exposure. Although Matz, Pearson, Reese, and Wells do not assert that they have RADS, they contend that they do have breathing difficulties that may be considered permanent.

According to Plaintiffs' expert, Dr. Fredric Gerr, a board-certified physician in internal medicine and occupational medicine, RADS is a permanent condition that occurs when an individual has a sudden onset of non-allergic asthma caused by a high level exposure to an irritant gas. RADS is sometimes called irritant-induced asthma.[2]

Dr. Stuart Brooks, one of the first medical doctors to identify and describe RADS, explained that asthma was "a condition characterized by recurrent . . . episodes of cough, wheezing and shortness of breath." Dkt. No. 122, Ex. K., Brooks Dep. 16. Chlorine gas and chlorine dioxide gas are irritant gases that may cause RADS upon a sufficient exposure.

---

[2] Armstrong, Karmolengos, and Snipes, whose claims are not challenged by Durango's motion for summary judgment, also assert that they suffer from RADS. Unlike the Summary Judgment Plaintiffs, Dr. Gerr concluded that these three men were afflicted with RADS as a result of the exposure incidents. Dkt. No. 122, Ex. G; Dkt. No. 142, Ex. L, Gerr Dep. 55-64.

7

Dr. Brooks has described a methacholine challenge test as a pulmonary function test that consists of ten progressively increasing doses of methacholine, with breathing responses after each dose is administered. It is an objective test of airways reactivity. The highest level consists of sixteen milligrams of methacholine per milliliter. If there is a twenty percent or greater drop in the patient's forced expiratory volume within one second of expiration ("FEV-1"), the test is considered positive. Dkt. No. 122, Ex. K., Brooks Dep. 18.

If the twenty percent drop in FEV-1 occurs by the ninth level, at eight milligrams, all medical professionals would consider that a positive test. If it occurs at the sixteen milligram dose, however, some doctors might not consider the test "positive," while others would characterize the results as "intermediate." A positive methacholine challenge test result is a necessary, but not sufficient, element of a RADS diagnosis. According to Dr. Brooks, a substantial percentage of the general population will respond positively to a dose of methacholine at twenty-five milligrams per milliliter. Dr. Brooks also testified that some studies show that fifty percent

of heavy cigarette smokers have positive methacholine challenge test results.

In 2002, Dr. Gerr examined Burton, Matz, Pearson, Reese, and Wells to consider the extent of their pulmonary injuries. In April of that year, Burton was found to have moderately severe airway hyper-responsiveness as a result of a methacholine challenge test. However, according to Dr. Gerr, Burton gave no indication of breathing difficulty during the time of his examination.

While Dr. Gerr found that Burton endured temporary disabilities as a result of the exposure, the doctor could not reach any conclusion about Burton's long-term lung impairments, if any. Instead, Dr. Gerr noted that either Burton does not have asthma, or that he may have it, but is so preoccupied with his other maladies, like lack of energy, urinary tract impairments, and digestive tract problems,[3] that he does not recognize the condition.

On August 4, 2002, Dr. Gerr evaluated Matz's ongoing complaints of coughing and shortness of breath. Dr. Gerr concluded that, while there was no objective evidence that Matz

---

[3] There is no medical evidence in the record that supports the notion that Burton's energy, urinary, or digestive problems are the result of the exposure incident.

9

had a chronic pulmonary condition, he did suffer temporary injuries as a result of the exposure. Dr. Brooks concurred, finding that Matz's "initial complaints on June 3, 2000 were consistent with an acute irritation response." Dkt. No. 122, Ex. K., Brooks Dep., Brooks Report to CNA at 8.

During Dr. Gerr's examination of Pearson, the patient stated that he had difficulty breathing, especially while sleeping, and that he had headaches, a cough, and suffered from depression. Pearson was found to have mild airway hyper-responsiveness as a result of a methacholine challenge test. Dr. Gerr stated that Pearson's description of symptoms was consistent with the temporary effects of exposure to high levels of chlorine dioxide gas, and concluded that "his chronic persistent shortness of breath is consistent with long-term effects of that exposure." Dkt. No. 119, Ex. C, Gerr Consultation Report 5.

Likewise, Dr. Gerr found that Wells suffered temporary effects from the exposure, and that "his chronic persistent shortness of breath is consistent with long-term effects of that exposure." Dkt. No. 119, Ex. E, Gerr Consultation Report 6. The doctor concluded that the Durango exposure made some contribution to Wells' chronic respiratory illness.

AO 72A
(Rev. 8/82)

In contrast, Dr. Gerr found that Reese suffered only temporary injuries as a result of his exposure event, and that his chronic medical problems, including episodic dizziness, were not a result of the exposure.

Durango's expert, Dr. Phillips, filed a medical report that contradicts most of Dr. Gerr's conclusions. Dr. Phillips opined that Burton, Matz, and Reese have no permanent impairment related to the exposure, and that any permanent damage endured by Pearson and Wells is not the result of any gassing incident at Durango. While Durango concedes that the gases were released on the dates in question, it maintains that the gassing episodes were not of a sufficient duration or concentration to cause the injuries complained of by the Summary Judgment Plaintiffs.

On May 10, 2002, Plaintiffs filed this action. On July 7, 2004, the Court granted Durango's motion to sever the trial in the matter into two groups. One trial shall adjudge Durango's liability regarding the claims of the night shift Plaintiffs (Armstrong, Burton, Matz, and Pearson) occurring on June 2, 2000, and the other trial shall consider Durango's liability

11

for the claims of the day shift Plaintiffs (Karmolengos, Reese, Snipes, and Wells),[4] which occurred two days later.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in his favor. . . ", United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437 (11th Cir. 1991)(en banc)(internal quotation marks omitted).

---

[4] Johnson and Woodard have settled their claims against Durango. Dkt. No. 158 at 34.

12

The Summary Judgment Plaintiffs maintain that Durango acted negligently and recklessly in exposing them to toxic gases while they were invitees on its premises. Durango asserts that it is not liable because Burton, Matz, and Reese have no objective evidence of injury as a result of the exposure incidents, and because Pearson and Wells have produced no evidence that the exposure incidents caused their injuries to a reasonable degree of medical probability.

## DISCUSSION

### I. Burton, Matz, and Reese Have Produced Some Evidence of Injury as a Result of the Alleged Exposure

Durango asserts that Burton, Matz, and Reese have failed to present any objective evidence of injury related to the gassing episodes. In Dr. Gerr's report concerning Burton, the doctor noted that the link between the exposure and any long-term respiratory problem was unclear, given Burton's absence of symptoms at the time of evaluation. For that reason, Dr. Gerr failed to give Burton an impairment rating. Dkt. No. 119, Ex. A, Gerr Consultation Report 7-8. Dr. Gerr also found that neither Matz nor Reese had any objective signs of a chronic pulmonary condition. Dkt. No. 119, Ex. B, Gerr Consultation Report 6; Ex. D, Gerr Consultation Report 5-6.

13

Nonetheless, Dr. Gerr stated that he believed that all Plaintiffs sustained some injury as a result of the exposure incident at Durango. Dkt. No. 142, Ex. K, Gerr Aff. 8-9. The doctor reported that all the night shift Plaintiffs exhibited temporary symptoms widely recognized by the medical community as those associated with exposure to chlorine dioxide gas, and that all the day shift Plaintiffs exhibited temporary symptoms widely recognized by the medical community as those associated with exposure to chlorine gas. Dkt. No. 142, Ex. K, Gerr Aff. 3-4.[5]

Dr. Gerr's conclusions in his affidavit are consistent with the findings in his medical reports. If the trier of fact believes Dr. Gerr's testimony, it would be permitted to find that Burton, Matz, and Reese suffered from some impairment as a result of the exposure event. The injuries sustained by Burton, Matz, and Reese may not be permanent, or as severe as those suffered by some of the other Plaintiffs, but they are compensable.

---

[5] Additional evidence may support Matz's claims of temporary impairments as a result of the exposure. On June 14, 2000, Dr. Alan Siegel examined Matz, finding diminished breath sounds bilaterally and mild expiratory wheezing. A spirometry test result, which measures the volume of air entering and leaving the lungs, showed that Matz had a severe airway obstruction. Dr. Siegel decided to admit Matz to the hospital for intensive treatment of this condition.

AO 72A (Rev. 8/82)

## II. Pearson and Wells Have Submitted Sufficient Evidence of Causation

> When the defendant seeks summary judgment on the ground that there is no proof of causation, the plaintiff bears the burden of introducing evidence "which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to grant summary judgment for the defendant."

Hobday v. Galardi, 266 Ga. App. 780, 782 (2004) (quoting Shadburn v. Whitlow, 243 Ga. App. 555, 556-557 (2000)).

Durango asserts that Pearson and Wells have failed to prove causation because they have not shown that their injuries were caused by the gassing episodes to a reasonable degree of medical probability. Lewis v. Smith, 238 Ga. App. 6, 9 (1999)("In cases involving causation issues which can be resolved solely by expert medical testimony, the testimony must be based at least on a reasonable probability.").

Durango notes that a "possible" link is insufficient to carry this burden. Parrot v. Chatham County Hosp. Auth., 145 Ga. App. 113, 115 (1978); Maurer v. Chyatte, 173 Ga. App. 343, 344 (1985); Cannon v. Jeffries, 250 Ga. App. 371, 373 (2001); Maddox v. Houston County Hosp. Auth., 158 Ga. App. 283, 284

15

(1981); Patterson v. Fulton-DeKalb Hosp. Auth., 233 Ga. App. 706, 710 (1998).

Yet, Dr. Gerr stated that he believed, with a reasonable degree of medical probability, that all Plaintiffs in this case sustained injury as a result of the gassing incidents. Dkt. No. 142, Ex. K, Gerr Aff. 8-9. Dr. Gerr's opinion that Pearson had sustained long-term lung damage was based on abnormalities in Pearson's methacholine challenge test. As Durango emphasizes, Pearson had a long smoking history, and Dr. Gerr noted that smoking can cause abnormalities on a methacholine challenge test like those observed with Pearson. Nonetheless, Dr. Gerr stated that Pearson's "onset of symptoms and the reported limitation in activity that followed the exposure episode indicate that not all of the observed abnormality is likely attributable to smoking and the exposure event at Durango made some contribution." Dkt. No. 119, Ex. C, Gerr Consultation Report 5.

Thus, Dr. Gerr has indicated that Pearson's injuries would have been less severe in the absence of the gassing episode. The Court agrees with Durango's assertion that Dr. Gerr has not offered an opinion apportioning the percentage of Pearson's injury attributable to the exposure incident, as opposed to

16

other factors, like cigarette smoking. However, even if Durango's negligence only aggravated an already existing respiratory condition, the company is liable for whatever aggravation of the injury that it caused. E.g., Garner v. Driver, 155 Ga. App. 322, 325 (1980).

Contrary to Durango's contention, at no time did Dr. Gerr refer to Pearson's injuries as being merely a "possible" result of the exposure. Despite Durango's arguments, it is for the jury to apportion the harm caused by the gassing episode and Pearson's smoking history.

To prevail, Pearson need not eliminate all possible doubt regarding whether Durango's conduct was a cause in fact of his injury. He must only prove that it is more likely than not that the company's conduct caused his injury. Durango is free to argue to the jury that Pearson brought his breathing difficulties on himself, but Dr. Gerr's testimony could support a finding that the exposure event caused at least part of Pearson's injuries.

Likewise, Dr. Gerr concluded that Wells' "onset of symptoms and the reported limitation in activity that followed the exposure episode indicate that not all of the observed abnormality is likely attributable to smoking and the exposure

event at Durango made some contribution." Dkt. No. 119, Ex. E, Gerr Consultation Report 6.

Durango points out that Dr. Gerr also stated in his report that the exact contribution of the exposure incident to Wells' injuries could not be estimated with a high degree of certainty. Seizing upon this statement, Durango argues that Gerr's opinion fails to establish that the exposure contributed to Wells' injuries with the "high degree of certainty" required by Georgia law.

The Court must reject this argument. First, Dr. Gerr found that the exposure incident contributed to Wells' breathing difficulties. Nothing in the report indicates that the finding was based on a mere possibility, and the fact that he did not use the "magic words," "reasonable degree of medical certainty," does not disqualify this finding. See Cannon, 250 Ga. App. at 373.

Second, it is for the jury to determine what the contribution of the exposure, as opposed to cigarette smoking, is to Wells' pulmonary illness. The jury need not make its findings with a "high degree of certainty," just a preponderance of the evidence. Consequently, Dr. Gerr's statement is not determinative, insofar as the contribution of

the exposure to Wells' injuries is an ultimate fact for the jury to determine, based on a standard of proof less exacting than the one Dr. Gerr noted.

In sum, whether the injuries sustained by Pearson and Wells were caused by the alleged exposure incident is a disputed question of fact, and summary judgment is not warranted.

**CONCLUSION**

For the reasons explained above, Durango's motion for summary judgment is **DENIED**. See Dkt. No. 118. Snipes' motion for oral argument on the motion in limine is **DENIED** as moot. See Dkt. Nos. 133, 128, & 163.

**SO ORDERED**, this ___27th___ day of September, 2005.

_____
JUDGE, UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)